1  JOHN W. COTTON, SBN 54912
   jcotton@cgllp.com
2  COTTON & GUNDZIK LLP
   624 South Grand Avenue, 22nd Floor
3  Los Angeles, CA 90017
   Telephone: 213/312-1330
4  Telecopy:  213/623-6699

5  Receiver for Cherokee Gas Systems, Inc.

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11 SECURITIES AND EXCHANGE          Case No.: SACV 10-0018 JVS (ANx)
   COMMISSION,
12                                  RECEIVER'S FINAL REPORT AND
                                    MEMORANDUM IN SUPPORT OF
13          Plaintiff,              (1) APPROVING FINAL REPORT
                                    AND ACCOUNTING (2)
14      v.                          APPROVING FINAL
                                    DISTRIBUTION OF RECEIVERSHIP
15 THOMAS A. LABRY and              ASSETS (3) AUTHORIZING
   CHEROKEE GAS SYSTEMS, INC.,      ABANDONMENT AND
16                                  DESTRUCTION OF RECORDS (4)
          Defendants.              RELIEVING RECIEVER OF ALL
17                                  LIABILITIES AND DUTIES AND
                                    (5)APPROVING RECIEVER'S
18                                  REQUEST FOR PAYMENT OF FEES
                                    AND COSTS
19
                                    DATE:    September 12, 2011
20
                                    TIME:    1:30 p.m.
21
                                    PLACE:   Courtroom 10C
22

23

24 I. INTRODUCTION

25      On January 7, 2010, the Court appointed the undersigned, John W. Cotton

26 as the temporary Receiver of Cherokee Gas Systems, Inc. ("Cherokee") and its

27 subsidiaries and affiliates, including Iron Horse Petroleum, Inc. ("Iron Horse").

28 On January 15, 2010, the Court confirmed the appointment of Mr. Cotton as

1   Receiver.   Since that time the Receiver has filed two interim reports, and has now
2   completed all steps necessary to present a final accounting to the Court and to
3   request permission to make a disbursement of the remaining assets to defrauded
4   investors. The Receiver also requests in this motion that the Court absolve him of
5   further duties and liabilities with regard to the management of the Cherokee estate
6   and to allow the destruction of Cherokee records, after a reasonable notice period.
7       As the Court is aware from prior reports and the allegations in the SEC
8   action, Cherokee and Iron Horse purportedly were in the business of raising
9   money from the public for investment in a gas property in Cotton County,
10  Oklahoma known as the Walters Field Priddy Sand Unit ("Walters Field").  The
11  Receiver's overall management of the Receivership of Cherokee and Iron Horse
12  has been driven by the fact that the vast majority of funds raised by Cherokee and
13  Iron Horse were removed from the companies for purposes other than the
14  purchase of oil and gas assets, leaving very little for investigation and any return
15  to investors.[1] Most of the funds raised by the companies were withdrawn from
16  company accounts in cash withdrawals and in the form of payments to affiliates
17  of Cherokee and Iron Horse.  Other funds were used to operate the companies'
18  telemarketing operations, including the payment of large commissions to sales
19  personnel who conducted the telemarketing.  At the time the Receiver was
20  appointed, Iron Horse did not have any cash assets and Cherokee had cash
21  totaling only $151,328.82.  The Receiver has not identified any oil and gas
22  interests owned by Iron Horse, and identified only one material asset, a gas lease
23  – known as the Smether's lease – owned by Cherokee.  The Smether's lease had
24  operational problems, but initially appeared to be an asset with some commercial
25  value.  The Receiver also investigated whether Cherokee had any remaining

---

27  [1] As discussed herein, the Receiver's efforts to search for and recover assets for the Cherokee
28  estate since his appointment has been severely limited by the small amount of assets available
    to cover the costs of any such efforts. All the Receiver's tasks have been influenced by a need
    to minimize expenses to avoid depleting the estate completely.

1

interest in Walters Field.[2] That investigation has concluded that there was no interest in the Walters Field owned by Cherokee.

In light of the limited resources of Cherokee, the Receiver's primary effort over the past year has been to address the operational problems with the Smether's lease in an effort to see if it could become commercially viable and saleable, while otherwise minimizing expenses of administering the estate. It was hoped that the lease could be sold to provide additional funds to investors. This Final Report describes the outcome of that effort to obtain additional funds for distribution to investors. Additionally, this Final Report summarizes the assets and liabilities of the Cherokee and Iron Horse, and outlines the Receiver's plans for ending the Receivership and distributing any available assets to investors. This Report also serves as the Receiver's memorandum in support of his last request for payment of fees from the assets of the Receivership estate and a winding down of all Receivership tasks and obligations.

II. FINAL REPORT

According to the SEC complaint, Iron Horse and Cherokee both raised funds from investors by means of cold calling and high pressure sales. Both companies represented that investors would acquire an interest in Walters Field. Both companies raised funds through telemarketing activities. Iron Horse received funds from investors beginning no later than October 2007 and continuing through late 2008. Cherokee received funds from investors during 2009.[3] The SEC filed this action and obtained preliminary relief and the appointment of the Receiver in January 2010.

---

[2] Cherokee also had a contract to acquire a lease known as the McAninch lease. As explained in the First Interim Report, the Receiver determined that it was in the best economic interest of the Receivership not to complete the transaction.

[3] As far as can be determined, each company utilized different bank accounts, and there was no commingling of funds between two companies or their investors. This makes the job of returning funds to Cherokee investors somewhat easier, as their investments were segregated from those of Iron Horse investors.

A.   Iron Horse

Based on the bank records obtained by the SEC covering the period from October 2007 to November 2009, Iron Horse raised approximately $800,000 from investors. Due to the extremely limited resources in the Receivership estate and the high cost of forensic investigation, the Receiver did not undertake any special efforts to determine whether Iron Horse raised additional funds prior to October 2007.

When the Receiver was appointed in January 2010, Iron Horse did not have any cash in its one known bank account. The Receiver is aware of trade creditor liabilities of Iron Horse totaling $28,055.11. They were listed in Exhibit B to the Receiver's First Report. The Receiver has not located any Iron Horse assets with which to pay those liabilities. It is therefore recommended herein, among other things, that none of the assets of Cherokee that were recovered be used to pay any of Iron Horse's liabilities.[4]

The SEC's investigation revealed that Iron Horse obtained a 100% working interest and 68% net revenue interest in a gas lease in the Walters Field property in 2000. In 2004, the records indicate that Iron Horse conveyed 17% of the net revenue interest to Cherokee, and in 2007 conveyed 100% of the remaining working interest to Energy Group of America. Cherokee then conveyed what appeared to be a 15% net revenue interest to one Douglas Wolf in 2008, potentially retaining a 2% net revenue interest (if not extinguished by the 2007 conveyance to Energy Group of America or by other events, discussed below). On the face of these transactions, Iron Horse did not retain any interest in the Walters Field property.

The foregoing demonstrates that Iron Horse has liabilities but no assets. Accordingly, the Receiver does not recommend herein that investors in Iron

---

[4] None of the Iron Horse trade creditors has threatened the Receiver with a collection suit demanding payment, likely due to the small size involved.

1  Horse receive any distribution of assets from the Receivership Estate, rather that

2  all such assets be distributed to Cherokee investors.[5]

3    B.    Cherokee

4    Based on the bank records obtained by the SEC, during 2009 Cherokee

5  raised approximately $1,635,250 from investors for the purpose of investing in

6  the oil and gas wells, and specifically for acquiring interests in the Walters Field.[6]

7  As discussed below, Cherokee does not appear to have any interest in Walters

8  Field.  It did however, have an interest in the Smethers lease which as discussed

9  below, has been sold for $10,000 after having the interest appraised by a third

10  party consultant. Cherokee's current cash assets total approximately $ 91,844.26.

11  If the Receiver's fee petition accompanying this final report is approved, the

12  remaining cash assets will be reduced by approximately $12,000 leaving

13  approximately $80,000 for distribution to the approximately 46 known investors

14  in Cherokee.[7]

15    Smethers Lease.  When the Receivership was commenced, Cherokee

16  owned a 90% working interest in the Smethers lease, which produces natural gas.

17  Pursuant to a Gas Well Purchase/Turnkey Agreement Cherokee paid $37,500 to

18  acquire the lease (including one working well) and $120,000 to drill three

19  additional wells.  Ganer Oil Company ("Ganer Oil") is the operator of the lease.

20  The natural gas produced by the wells is sold to Mustang Gas Products, LLC

21  ("Mustang"). (Ganer also drilled the three additional wells, but as noted below,

22

23  [5] The Receiver does not recommend pooling the assets of Cherokee with Iron Horse for the purpose of making a distribution to investors.  Cherokee and Iron Horse raised money from investors during distinct time periods and maintained separate bank accounts.  There is no evidence of commingling of funds between the companies.

24

25  [6] This number is net of two investment returns to investors, one for $25,000 and one for $12,500. The amounts involved are small and occurred within one month after their investment was made. As discussed infra, the Receiver recommends against seeking the return of these funds.

26

27

28  [7] The final amount for distribution depends on the remaining fees of making this report and distributing funds. The $12,000 is an estimate which includes current unpaid fees and disbursements of $8797.13 and projected costs of the distribution and wind-up of affairs.

4

the resulting collection of gas from all wells on the leasehold does not amount to enough to give it material value.)

From the time of the Receiver's appointment in January 2010 through approximately December 2010, the one operating well on the Smethers lease was plagued with operational problems. By way of background, the natural gas produced by the well on the Smethers lease is delivered into a collection pipeline operated by Mustang. At the time of the Receiver's appointment, successful delivery of natural gas into the Mustang collection pipeline required Cherokee to operate a compressor and separator to increase the pressure level of the gas produced by the well above the pressure of the collection pipeline. Since the Receiver's appointment, the compressor, the separator and related equipment on the Smethers lease have failed at various times, resulting in significant repair costs to the estate. As a result of these failures, the wells often have not been able to deliver gas into Mustang's collection pipeline, and Cherokee did not receive revenue on a consistent basis during 2010.

Since the Smethers lease represented the only potentially viable asset of Cherokee, the Receiver worked with Ganer Oil to repair and ultimately replace equipment, with the goal of generating consistent production and revenue from the wells that would be attractive to a buyer. In addition to regular maintenance on the wells, in February 2010 the Receiver authorized the operator to repair the compressor on the Smether's lease, and to replace the separator. Because the original compressor continued to fail, in approximately March 2010 the Receiver authorized the operator to purchase a new compressor. The total cost of maintenance, repairs and a new compressor and separator has been approximately $12,479.

Regrettably, these efforts have been commercially unsuccessful, as the wells did not produce natural gas in significant volume or on a consistent basis

5

during most of 2010 to make them valuable to an investor. [8]  Between January 2010 and October 2010, the net monthly revenues ranged from zero dollars for the months of April, July and August to a high of $267 in June.  Based on discussions with the operator, the Receiver had hoped to increase net revenues to three or four times the June level.  This never occurred.

In order to determine a value for the Smethers lease to sell it, the Receiver hired an independent petroleum consultant to value the interest in the Smether's lease. That appraisal, attached to the Declaration of John W. Cotton in Support of Motion for Distribution and Payment of Fees and Costs filed concurrently herewith ("Cotton Declaration") as Exhibit C, arrived at a value of only $1,396, based on what the consultant considered to be a very low level of estimated future reserves in that field, and the projected yearly cost of upkeep of the well, which could reasonably be expected in some years to be more than its income. Additionally, and a large factor in accepting the offer to purchase the lease described below, the consultant noted that if the well became depleted, there would be a large shut down and potential environmental clean up cost to the Receivership estate. These costs, along with the annual upkeep, presented a severe challenge to the Receiver in selling the leasehold. Considering the small size of the available liquid assets to distribute (i.e. slightly less than $80,000) any further time and effort at valuation, or even promoting a sale to another buyer, could erode the assets of the estate to the point of eliminating any return to investors.

During the process of working with Marc Ganer, the original seller of the lease, he expressed an interest in purchasing it.  Ganer agreed to purchase the Smether's lease for $10,000, which was seven times more than the appraised value.   While it is possible that the Receiver could have sold the Smether's lease

---

[8]  Since the commencement of the Receivership, only $2,305.10 has been received from Mustang for gas sales from the Smethers lease.

for a higher price if he had undertaken additional marketing efforts, the Receiver determined that the cost of those efforts was not warranted in light of the estate's very limited cash resources.  Moreover, in light of the seven time premium over the appraised value, the likelihood of a sale at a higher price seemed unlikely. Even if more time would have produced a better price, the Receiver had to balance the small and dwindling estate cash, with the likelihood of obtaining anything larger than $10,000. He also had to factor in the possibility that at any time, additional, expensive operating repairs would be required. It was decided in the Receiver's exercise of judgment that further efforts would not be cost effective and therefore Ganer's counteroffer was accepted.

Walters Field.  As discussed above in connection with Iron Horse, Cherokee appeared on paper to have retained a 2% working interest in Walters Field based on previous sales of interests it made.  The Receiver located the operator of Walters Field, the Energy Group of America, and spoke with the purchaser of the gas product produced by Walters Field, Enterprise Products Inc. Ms. Belinda Cathey of Enterprise Products was kind enough to search the field records, and based on her search she informed the Receiver that she finds no residual interest in the field held by Cherokee. While Cherokee could retain another expert or a lawyer to conduct a further record title search, based on the small size (less than 2%) of the possible residual interest and the limited cash resources, the Receiver determined that the additional expenditure would not have been prudent. The Receiver therefore recommends no further investigation with regard to the Walters Field.

Other Assets.  The only other assets of Cherokee that were recovered from its rented offices had nominal, if not non-existent value.  These include the half dozen computers removed by the Receiver, as well as peripherals (e.g., monitors, printers, keyboards).  The Receiver has attempted to liquidate these assets on eBay and Craigslist, but they are so old, and of minimal quality to have received

7

no offers to purchase them. [9]The Receiver also came into possession of an imitation Remington sculpture (mentioned in earlier reports) which is also of little value.

Any further undertakings to either appraise, sell or dispose of these tangible assets for value would likely cost more in the effort than makes economic sense. Therefore, the Receiver requests permission of the Court to offer these items to the defrauded investors. The computers and peripherals would be offered to the investors on a first-come, first-served basis. As to the *faux* Remington sculpture,[10] if the Court approves, it will be raffled in a blind lottery open to any defrauded investors who are willing to pay to either pick it up (it is extremely heavy – approximately 200 lbs.) and/or pay for its shipment to them.[11] This is the only way short of giving the items to charity that the Receiver can come up with to dispose of these nominally valued assets.[12]

Defendant Labry also has stated that Cherokee paid approximately $200,000 to one Mark Cook in a transaction involving oil and gas.  The Receiver has not found any record of this transaction in the known bank records, or in the records seized from Cherokee's premises. The Receiver has asked Labry on several occasions to provide documents about this alleged oil and gas transaction,

---

[9] At the request of the U.S. Attorney's Office, the Receiver did not sell or dispose of the computers while the criminal proceedings against defendant Labry were continuing. Labry's sentencing in the Cherokee matter will soon occur at which time the computers can be disposed of.

[10] As mentioned in an earlier report, there was a fake Remington sculpture in the offices which Cherokee employees said was a fake but purchased for a few thousand dollars. This sculpture weighs over two hundred pounds, is cumbersome and costly to store. Both the SEC and the Receiver believe that any further efforts to sell it will consume more time and cost than can be reasonable expected in recovery.

[11] One Cherokee salesman claimed he purchased the Remington with his money from a pawnbroker. When the Receiver asked the pawn broker for a sworn declaration to that effect, he refused to provide it. The Receiver therefore does not attribute any credibility to the salesman's claim and recommends that it be disregarded.

[12] The Office of U.S. Attorney has requested that the computers not be released until after the sentencing of Defendant Labry. The Receiver will honor this request.

but he has not done so.  In light of Cherokee's limited assets and the absence of any documentary evidence, the Receiver does not intend to spend additional resources to determine if any such transaction actually occurred.

Liabilities.  The Receiver has identified accounts payable owed by Cherokee.  The payables total $3,438.69 and were listed in Exhibit A to the First Report.  None of the Cherokee trade creditors has ever contacted the Receiver demanding payment, likely due to the small size involved. It is recommended that no payments be made to Cherokee creditors due to the small amount of assets available to pay defrauded investors and any lack of effort by them to collect.

C.      Expenditure of Receivership Assets

The following table accounts for the expenditure of Receivership assets since the commencement of the Receivership. (A complete list of all transactions in the Receivership estate bank account to date is attached to the Cotton Declaration as Ex. B)

| | |
|---|---|
| Beginning Cash | +$151,328.82 |
| Smether's Operations and Repairs | -$12,479.12 |
| Bank Fees | -$60.00 |
| Legal Fees and Costs (including accrued legal fees subject to approval herein) | -$63,489.59 |
| Petroleum Consultant | -$2,908.97 |
| Bookkeeping and Accounting (Tax Returns) | -$1,207.50 |
| Smethers Income and Well Sale Proceeds | +$12,304.80 |

| Current Balance[13] | $83,488.44 |
|---|---|

## III.  RECEIVER'S FINAL ACTIVITIES

### Distribution to Investors

Over the next two months, the Receiver will undertake the task of making a small distribution to the approximately 46 Cherokee investors from the remaining estate funds.[14] It appears from a rough calculation that these investors will only receive approximately .05 cents on each dollar of investment. The Receiver also will hold a lottery to dispose of the remaining nominally valued assets described above.

There are two investors who appeared to have received back the funds they invested, in the amounts of $12,500 and $25,000 respectively. The return of these funds was shortly after (within one month of) their original investment. While an argument can be made that they should have "claw back" claims filed against them by the Receiver for a return of the returned investment, such does not appear economically viable. Both reside in Florida, and the small amounts involved would alone prohibit the cost of any successful collection efforts in court. Likewise, the quick return of the funds suggests that there may have been some error involved in the wire and the investors proved that they had not made the investment and were entitled to a return. In any event, due to the size of the estate and the cost of collection, the Receiver advises against efforts to collect.

There are no other issues of any legal complexity involved in returning funds to investors, as the SEC provided the Receiver with a reliable list of investors, amounts invested and addresses. The distribution will be a pro rata

---

[13] This balance includes accrued, but as yet unpaid legal bills through July 31, 2011. It does not include any time and expenses in the creation and presentation of this report.
[14] There are still a few deposits to the Cherokee bank account that are unaccounted for and if investors for those funds are located, the number of investors could change. Likewise, some investors invested both individually and in a family trust, but are counted as one investor.

return, based on the amount of each investor's original investment. A simple confirmation letter process is in place currently to validate the amount each of the 46 investors put into Cherokee.

B  Further Investigation

In light of the extremely limited resources of the Receivership, the Receiver does not intend to undertake any additional investigation that could, potentially, lead to the discovery of additional assets.  As noted above, the Receiver does not intend to make further investigation of Labry's claim of a $200,000 transaction with Mark Cook.  The Receiver does not intend to conduct further asset searches, and does not intend to investigate further the use of funds by Cherokee and Iron Horse.  The Receiver believes that it is more prudent to forego these searches and preserve the remaining assets in order to make a small distribution to investors.  As noted above, the Receiver does not anticipate any distribution to Iron Horse investors.

IV.  RECEIVER'S FEES AND EXPENSES

The Receiver's fees and costs for time spent on this matter from commencement though July 2011 total $63,490. Of this amount, the Receiver has been paid $54,692.   The invoices that detail the previously paid fees and expenses were attached as Exhibit A to the accompanying Declaration of Robert B. Ericson in Support of Receiver's Second Interim Report and Request of Payment of Fees and Costs ("Ericson Declaration") filed on April 12, 2011.

The Receiver makes application here for the remaining legal fees and costs. The Receiver agreed with the SEC to administer this matter at an hourly rate of $325 per hour, which is a discount from the Receiver's and Mr. Ericson's standard hourly rates. By utilizing the services of Ms. Diaz, the average hourly rate for professional services has been approximately $295 per hour.  The Receiver asks the Court to approve the unpaid fees and expenses incurred to date and authorize

their payment from the Receivership assets. These currently total $8,797.13, and are reflected in the Cotton Declaration, <u>Exhibit A</u>.

V. <u>AUTHORIZATION TO ABANDON OR DESTROY RECORDS</u>

The Receiver asks that the Court permit him to destroy all records maintained of the estate after a period of 120 days from the approval of this report, and upon giving the SEC 60 days advance notice. After the return of the assets to the investors, there will be no further activities of the estate but the Receiver would be required to maintain records at his cost in storage unless approval is given to a destruction of these records after a reasonable time.

VI. <u>RELIEVING RECIEVER OF ALL FURTHER DUTIES AND LIABILITIES</u>

With the proposed distribution and payment of fees and expenses, there will be no further duties or responsibilities of the Receiver to the estate. The Receiver would therefore request that this Court absolve him of any further responsibility, or liability after the disbursement to investors.

VII. <u>CONCLUSION</u>

The Receiver's decisions in this case have been driven at every turn by the goal of preserving as much as possible of the limited resources of the estate, which consisted primarily of $151,000 in cash. With this objective in mind, the Receiver made reasonable expenditures (less than 10% of the original cash) to improve the value of the Smether's lease. In all other instances, the Receiver has preferred to preserve cash assets rather than pursue professional fees spent by Cherokee, or incur other expenses.

At this time, the Receiver recommends terminating further investigation and expenditure in favor of making a modest distribution to investors. Accordingly, the Receiver asks the Court to enter an order: (1) approving a pro rata distribution of the remaining cash assets to the 43 known investors in Cherokee on a *pro rata* basis; (2) approving the Receiver's recommendation not

12

to distribute any of the estate assets to Iron Horse; (3) authorizing the disposition of the computers, peripherals and faux Remington statue as set forth above; (4) permitting the destruction of records as set forth above; (5) authorizing the Receiver to destroy and abandon records as set forth above; (6) approving the Receiver's request for payment of fees and costs; and (7) relieving the Receiver of all liabilities and duties.

Dated:  August 8, 2011

JOHN W. COTTON
COTTON & GUNDZIK LLP

JOHN W. COTTON

Receiver for Cherokee Gas Systems, Inc.

13