JOHN W. COTTON, SBN 54912
jcotton@cgllp.com
COTTON & GUNDZIK LLP
624 South Grand Avenue, 22nd Floor
Los Angeles, CA 90017
Telephone: 213/312-1330
Telecopy: 213/623-6699

Receiver for Cherokee Gas Systems, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS A. LABRY and CHEROKEE GAS SYSTEMS, INC.,<br><br>Defendants. | Case No.: SACV 10-0018 JVS (ANx)<br><br>DECLARATION OF JOHN W. COTTON IN SUPPORT OF OPPOSITION TO REMOVE RECEIVER<br><br>DATE: October 3, 2011<br>TIME: 1:30 p.m.<br>PLACE: Courtroom 10C |

DECLARATION OF JOHN W COTTON ISO OPPOSITION TO MOTION TO REMOVE RECEIVER

# DECLARATION OF JOHN W. COTTON

I, John W. Cotton, declare as follows:

1. I am a partner in the law firm of Cotton & Gundzik, LLP ("Cotton & Gundzik"). This declaration is offered to support my Opposition to defendant Thomas Labry's "Motion to Remove and Replace Receiver" ("the Motion"). The Court appointed me as the Receiver of Cherokee Gas Systems, Inc. ("Cherokee") and its subsidiaries and affiliates on or about January 7, 2010. I have personal knowledge of the matters set forth in this declaration, and could and would testify competently to their truth and accuracy if called as a witness.

2. The Cotton & Gundzik professional personnel chiefly working on this receivership were Mr. Robert Ericson ("Ericson") and me.

3. Upon being appointed Receiver, I instructed Mr. Ericson, who was chiefly responsible for the day to day activities of the Cherokee Receivership, to try to obtain information from Mr. Labry in connection with my assignment to locate assets of the receivership estate. As part of his response to that request, he sent several letters to defendant Labry on February 3 and 15, 2010 and on April 18, 2011. Each of these letters requested the cooperation of defendant Labry in helping me to locate assets of the receivership estate.

4. A few times prior to his arrest and incarceration, defendant Labry would call me, and I would ask him about the existence, location and documentary support for Cherokee assets. During most of these calls, however, defendant Labry was unintelligible and incoherent and I suggested he call me only when he was fit to speak.

5. To the best of my knowledge and belief, at no time did defendant Labry ever mention an oil and gas lease known as the "Edith and Earl" lease. While defendant Labry alluded to the existence of an unnamed lease allegedly purchased with a $200,000 payment to an individual he named as "Mark Cook",

1

he never provided me with any documents or information that would have supported a completed lease transaction with a Mark Cook, nor did he provide me with specific information about the transaction he now refers to as the "Edith and Earl" lease. Likewise, to the extent the Motion refers to a "fully executed lease" regarding the Edith and Earl transaction, none has ever been provided to me, nor was one attached to the Motion.

6. Defendant Labry in his Motion attaches a number of documents concerning the so-called "Edith and Earl" lease which were never brought to my attention by him, or anyone else at his direction, during the course of the receivership. Among them were the February 21, 2006 Barbour Energy Corporation Letter ("the Barbour letter"), Ex. C, p.1576; Ex. E, p.1584 and Ex. H, p.1599; the undated and unsigned document in Ex. E, p.1586, which makes a vague reference to Cherokee "buying a 25% WI [working interest] in the Edith, Earl (sic) lease"; and the redacted, one paragraph extract of something called "Exhibit B" so a non-specified "conveyance", with the names "Edith and Earl" at the top, contained in Ex. E at p.1588. I have concurrently filed an evidentiary objection to the introduction of these documents.

7. Defendant Labry did advise Mr. Ericson in early February 2010, of the existence of an alleged transaction known as the McAninch lease. However, after being informed of the alleged transaction and being provided with a copy of it, I informed defendant Labry (as well as the Court in the First and Second Interim Reports) that this transaction called for a payment of $65,000 to the seller and the cost of drilling three wells (at $40,000 each) which would have consumed all the known estate assets. I further informed Mr. Labry that I would not risk the remainder of the estate assets on oil and gas exploration by concluding this alleged transaction with the payment of $65,000.

8. Defendant Labry in his Motion attaches a number of documents concerning the McAninch lease which were never brought to my attention by him

during the course of the receivership. Among them was the February 21, 2006 Barbour Energy letter referred to above in Para. 6. This unauthenticated letter, which is over five years old, purports to reference in its subject heading, the "Edith and Earl" lease, the McAninch lease and the Smethers No. 1-31 lease.

9. After being appointed Receiver, and learning of the Walters Priddy Field Unit, McAninch and Smethers leases, I instructed Mr. Ericson to locate an attorney in Oklahoma that could assist us with obtaining information about them, in particular to evaluate the viability of the Smether's lease. Mr. Ericson reported to me that the attorney that he spoke with suggested that the more important task was to determine what the production was on the Smethers lease, and what it was worth. That attorney recommended Lee Keeling & Associates ("LKA") as qualified petroleum engineers to assist us.

10. In or about March of 2010, LKA reported a number of things to Mr. Ericson, including information to assist us in contacting the operator of the Walters Priddy lease, and gave a preliminary opinion on the viability of the Smethers lease. A copy of the LKA letter on the Smethers lease is attached to Mr. Ericson's declaration as Exhibit D.. The LKA letter reported that the estimated cost of operation on the Smethers lease was $500 a month, or $6000 a year.

11. Upon reviewing the preliminary assessment of LKA on the Smethers lease, I instructed Mr. Ericson to find out what would be required to establish a consistent course of production on the Smether's lease. I reported what Mr. Ercison told me in my Second Interim report to the Court.

12. Throughout the period of March to November, 2010, I was asked to front a number of expenses from the dwindling estate assets to get the Smethers operation into production capacity. As the costs began to exceed $7,500 I became concerned and advised Mr. Ericson to see how little could be spent to bring the well to operation before asking LKA to appraise it, in order to conserve dwindling estate assets. The repair and replacement costs involved ultimately rose

to almost $13,000. My chief concern then was the likelihood of additional equipment failures, as the operator reported that all of the equipment was old and needed constant repair or replacement. The wells on Smethers also lacked sufficient pressure when gas was coming out of the ground, which required sophisticated pumps to increase the pressure to the collection point.

13. After several months of operation sufficient to establish a value of the Smether's lease, I again asked LKA for a formal opinion of the value. That opinion is attached to my Motion to Approve Final Report. While the value was almost non-existent, I understood that to be due to the fact that on average, the Smether's well was only generating $0 to $300 in gas per month, while being exposed each month to a possibility of $500 in operating costs.

14. Mr. Ericson informed me that LKA advised him of the potential environmental liability of allowing the original Smether's well to remain uncapped, as well as the continued liability of operating a well that could cause environmental damage for which the lease holder might be liable. LKA also advised of this in the March 24, 2010 letter referred to above.

15.) Mr. Ericson informed me that while discussing the Smether's well, the owner and operator of Mustang Gas Products LP, Mark Ganer, indicated that if the estate wished to eliminate the operating cost requirement and potential liability, he might be willing to buy the lease back, as Mustang originally sold it to Cherokee for $37,500 in 2009.

16. After reviewing the opinions of LKA in their two letters to me, and considering the potential economic and environmental liability that could occur at any time, and considering the low amount of capital available to the estate ($90,000 at that time), I determined to get the best offer that Mr. Ganer would give, and to do so before another operational failure, or an environmental disaster occurred, either of which could have wiped out the remaining small capital of the estate.

17. I asked Mr. Ganer to give me his best and final offer, without disclosing to him the LKA value opinion. He said his best offer was $10,000 since he was assuming all future liability, but could reduce operating costs by doing the work himself to make the three operating wells barely profitable.

18. I exercised my best business judgment, and my authority under the Court's order of appointment, to immediately sell the Smether's interest to Mustang for the amount that Ganer said was his best offer. I did so quickly to ensure that the offer was not withdrawn in the event of another operational equipment failure which would have further depleted the estate assets, and before the occurrence of a liability producing event that could expose the estate to more loss.

19. Attached hereto as Exhibit A, is a screen shot of the historical annual "Well Head" price of gas as reported on September 14, 2011 which is provided online by the U.S. Energy Information Administration. Since 2005, the price per thousand cubic feet in the United States has declined from $7.33 to $4.16, or 43%.

20. Mr. Labry did not have counsel in this proceeding. Nonetheless, on May 13, 2010 I caused to be served on Mr. Labry a copy of the First Interim Report at his last known address at 205 33rd St., Newport Beach, CA 92633. A copy of the proof of service was filed with this Court. On or about April 12, 2001 I caused to be served on Mr. Labry at the Santa Ana Jail, a copy of the Second Interim Report and filed a copy of the proof of service with this Court.

21. Attached hereto as Exhibit B is an email which was received by my office from Belinda Cathey of Enterprise Products LLC, the company which accounts for and pays out on the producing wells located in the Walters Priddy Field Unit. Ms. Cathey reported to me on June 1, 2011 that "the interest [of Cherokee] was sold" and that while she was quite busy, she would follow up with the documentation to show that.

22.  At no time during my role as Receiver of Cherokee has Mr. Labry provided me with any documents or information concerning any residual interest in the so-called "Walters Priddy Field Unit". In at least one conversation with Mr. Ericson, Mr. Labry stated "all, or most of" the interest in the Walters Priddy Field Unit" had been conveyed to another. See Decl. Ericson ¶ 6, Ex. D. I could not locate any evidence, even after getting assistance from LKA, as well as contacting the operator and revenue collector from the leasehold, that Cherokee had any residual interest in this lease.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of September, 2011 in Los Angeles, California.

_____
John W. Cotton

DECLARATION OF JOHN W COTTON ISO OPPOSITION TO MOTION TO REMOVE RECEIVER


U.S. Energy Information Administration

# NATURAL GAS

OVERVIEW | DATA | ANALYSIS & PROJECTIONS                                           GLOSSARY ›   FAQS ›

## Natural Gas Prices
(Dollars per Thousand Cubic Feet, except where noted)

Area: U.S.          Period: Annual

| Data Series / Area | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | View History |
|---|---|---|---|---|---|---|---|
| Wellhead Price | 7.33 | 6.39 | 6.25 | 7.97 | 3.67 | 4.16 | 1922-2010 |
| Imports Price | 8.12 | 6.88 | 6.87 | 8.70 | 4.19 | 4.52 | 1985-2010 |
| By Pipeline | 8.09 | 6.83 | 6.83 | 8.57 | 4.13 | 4.46 | 1985-2010 |
| As Liquefied Natural Gas | 8.26 | 7.19 | 7.07 | 10.03 | 4.59 | 4.94 | 1985-2010 |
| Exports Price | 7.59 | 6.83 | 6.92 | 8.58 | 4.47 | 5.02 | 1985-2010 |
| By Pipeline | 7.77 | 6.90 | 6.96 | 8.62 | 4.34 | 4.75 | 1985-2010 |
| As Liquefied Natural Gas | 5.79 | 6.02 | 6.23 | 7.69 | 8.40 | 9.53 | 1985-2010 |
| Pipeline and Distribution Use Price | -- | | | | | | 1967-2005 |
| Citygate Price | 8.67 | 8.61 | 8.16 | 9.18 | 6.46 | 6.16 | 1973-2010 |
| Residential Price | 12.70 | 13.73 | 13.08 | 13.89 | 12.14 | 11.21 | 1967-2010 |
| Percentage of Total Residential Deliveries included in Prices | 98.19 | 98.09 | 98.05 | 97.5 | 97.4 | 96.5 | 1989-2010 |
| Commercial Price | 11.34 | 12.0 | 11.34 | 12.23 | 10.06 | 9.15 | 1967-2010 |
| Percentage of Total Commercial Deliveries included in Prices | 82.1 | 80.8 | 80.4 | 79.9 | 77.8 | 71.1 | 1987-2010 |
| Industrial Price | 8.56 | 7.87 | 7.68 | 9.65 | 5.33 | 5.40 | 1997-2010 |
| Percentage of Total Industrial Deliveries included in Prices | 24.1 | 23.4 | 22.2 | 20.5 | 18.8 | 16.9 | 1997-2010 |
| Vehicle Fuel Price | 9.14 | 8.72 | 8.50 | 11.75 | 8.13 | | 1989-2009 |
| Electric Power Price | 8.47 | 7.11 | 7.31 | 9.26 | 4.93 | 5.26 | 1997-2010 |

- = No Data Reported;   -- = Not Applicable;   NA = Not Available;   W = Withheld to avoid disclosure of individual company data.

Notes: Prices are in nominal dollars. Gas volumes delivered for use as vehicle fuel are included in the State annual totals through 2009 but not in the State monthly components. Through 2001, electric power price data are for regulated electric utilities only; beginning in 2002, data also include nonregulated members of the electric power sector. See Definitions, Sources, and Notes link above for more information on this table.

Release Date: 8/29/2011
Next Release Date: 9/29/2011

EXHIBIT: A
PAGE NO: 7

**John Cotton**

**From:** Cathey, Belinda [BJCathey@eprod.com]
**Sent:** Wednesday, June 01, 2011 1:38 PM
**To:** John Cotton
**Cc:** Robert Ericson
**Subject:** RE: Status of Cherokee Interest in Walter Priddy Field

Hi John, the interest was sold and I have been compiling the documents. The previous Operator has provided some documentation, but it hasn't gone as quickly as I'd hoped. I will be finishing with what we have as soon as possible, but it's been a very busy time for us, so please be patient.

Thank you!

**Belinda J. Cathey, CDOA - Division Order Analyst III**
**Enterprise Products - Enterprise Crude Oil, LLC**
**210 Park Ave., Ste. 1600**
**Oklahoma City, OK 73102-5630**
**Tel (405) 239-5762 - Fax (405) 604-5862**
**bjcathey@eprod.com**

**From:** John Cotton [mailto:JCotton@cgllp.com]
**Sent:** Wednesday, June 01, 2011 3:28 PM
**To:** Cathey, Belinda
**Cc:** Robert Ericson
**Subject:** Status of Cherokee Interest in Walter Priddy Field

Belinda,

Rob Ericson left me your name and email address with regard to the work you were doing to see if Cherokee had any remaining interest in the Walter Priddy Field. Could you update me on the status of this? Rob has left our office and I am taking over the Cherokee matter. If you wish to call me, my direct dial is 213-312-1336. Thanks. John Cotton

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

EXHIBIT: B
PAGE NO: 8